UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMIE SHOULDERS,<br><br>Defendant. | 5:17-CR-50090-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant Jamie Shoulders' Motion to Suppress Statement (Doc. 89). A hearing was held on December 13, 2017. Defendant was personally present and represented by his attorney of record, Greg Erlandson. The Government was represented by Assistant United States Attorney Kathryn Rich. Special Agents Matt Weber and Tyler Vose testified at the hearing. Two exhibits were received into evidence. Both parties have submitted briefs, and supplemental briefing was concluded on February 12, 2018. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

### **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be granted.

## JURISDICTION

Defendant is charged in a Superseding Indictment with Second Degree Murder in violation of 18 U.S.C. §§ 1111, 2, and 1153; Discharge of a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and Possession of a Firearm with Obliterated Serial Number, in violation of 18 U.S.C. §§ 922(k) and 921(a)(1)(B).  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

On May 27, 2017, tribal law enforcement arrested Defendant Jamie Shoulders pursuant to a federal warrant for violating the terms and conditions of his supervised release in a 2015 case.  On May 31, 2017, federal law enforcement charged Mr. Shoulders in a Complaint with First Degree Murder. 5:17-mj-85.  The Complaint alleged that Mr. Shoulders shot and killed Chris Janis on May 27, 2017, near Sharps Corner, South Dakota.

On June 1, 2017, at approximately 9:45 a.m., FBI Special Agents Tyler Vose and Matt Weber retrieved Mr. Shoulders from the Pennington County Jail and interrogated him at the Pennington County Investigation building.  (Doc. 106 at p. 5).  The recorded interrogation took place in a small interview room, with enough space to fit three or four people.  (Id. at p. 6–7).  Mr. Shoulders remained in handcuffs for the entirety of the interrogation.  (Id. at p. 10). Agent Weber acted as the primary interviewer, and Agent Vose served as the secondary interviewer.  (Id. at p. 38).  At the end of the 56-minute

2

interrogation, the agents returned Mr. Shoulders to the Pennington County Jail.  (Id. at p. 20–21).

Before advising Mr. Shoulders of his Miranda rights to counsel and to remain silent, Agent Weber stated that he needed some biographical data, and asked Mr. Shoulders if he had a Facebook account, any other "social media stuff," or a cell phone number.  Mr. Shoulders responded that he did not.  (Ex. 1 at 00:26–44).  At that point, the following discussion occurred:

| Mr. Shoulders: | *I don't know what this is about, so I am going to remain silent then.* |
|---|---|
| Agent Weber: | Oh, okay, sure. |
| Mr. Shoulders: | *I have the right to remain silent so—* |
| Agent Weber: | [Interrupting and talking over Mr. Shoulders]: Yeah, we will make it real clear.  [To Agent Vose]: Get that advice of rights form.<br>So you don't have to say anything.  I will do all of the talking.  So you are being charged with first degree murder. |
| Mr. Shoulders: | On what? |
| Agent Weber: | The penalty for first-degree murder is life in prison. |
| Mr. Shoulders: | Yeah, I know but— |
| Agent Weber: | It is a pretty serious charge. |
| Mr. Shoulders: | What am I being charged for?— |
| Agent Weber: | [Talking over Mr. Shoulders]:  I will lay it all out, I will lay it all out. |
| Mr. Shoulders: | I don't know what you guys are talking about— |
| Agent Weber: | So here is the deal. |
| Mr. Shoulders: | What is that? |

3

[Silence from 1:30–2:15; sound of turning pages]

Agent Weber then read Mr. Shoulders his <u>Miranda</u> rights.  (Ex. 1 at 2:15–2:45).

| | |
|---|---|
| Agent Weber: | . . . Do you understand your legal rights? |
| Mr. Shoulders: | Yup. |
| Agent Weber: | If you don't mind, I'd just like you to, uh, sign the bottom right here just saying that I read you your rights.[1] |
| Mr. Shoulders: | *I need my attorney man, I ain't gonna do nothing until—* |
| Agent Weber: | [Interrupting and talking over Mr. Shoulders] That's fine. You can sign that and you can lawyer up, that is fine. You don't have to sign it, that is fine.  All right. |
| Mr. Shoulders: | I don't know what you guys are talking about.  I don't know what all of this is in front of me.[2] |
| Agent Weber: | Okay, so here is the deal.  You are at a point.  You are at a crossroads, ok? |
| Mr. Shoulders: | In what? |
| Agent Weber: | We know everything.  We talked to [codefendants' names].  We know everything. |
| Mr. Shoulders: | Well what do you know? |
| Agent Weber: | So here's the deal.  You could take the path of cooperation and help us out. |
| Mr. Shoulders: | If you guys know everything then— |
| Agent Weber: | [Interrupting] And I could go—I could go— I'm going to explain.  You could choose the path of cooperation and I can go to the U.S. Attorney and I can say hey, Jamie |

---

[1]    The form that Agent Weber attempted to have Mr. Shoulders sign at this point was a standard FBI Advice of Rights Form FD-395.  The consent portion stated "At this time, I am willing to answer questions without a lawyer present."  (Ex. 2).

[2]    Agents Weber and Vose placed photos in front of Mr. Shoulders of the gun recovered from the scene and of the deceased body of Chris Janis in his van.  (Doc. 106 at p. 37–38).

|                 |                                                                                                                                                                                  |
|-----------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                 | is trying to help us out.  He is trying to do the right thing and clear . . . all of this up.  Or, I can say, he refused to talk.  He doesn't want to help us out.                  |
| Mr. Shoulders:  | And what does that do?                                                                                                                                                            |
| Agent Weber:    | So if you have, if you want to have any hope of leniency or anything else, any kind of a deal, anything like that. I can't promise you anything, but cooperating is the only way we can get that to happen. |
| Mr. Shoulders:  | What, what do I have to do with all of this anyway?                                                                                                                               |
| Agent Weber:    | Well, I know, I know.                                                                                                                                                             |
| Mr. Shoulders:  | You know what?                                                                                                                                                                    |
| Agent Weber:    | What you know.                                                                                                                                                                    |
| Mr. Shoulders:  | You know what?                                                                                                                                                                    |
| Agent Weber:    | *My only question in all of this, our only question—we can't figure this out.  This is the one piece I would like you to help me answer.  Why shoot Chris Janis?* |
| Mr. Shoulders:  | I didn't shoot him.  I didn't shoot him.  That's all I got to say.  I ain't the shooter man.  That's all I got to say. |
| Agent Vose:     | You know what, you have already asked for an attorney and that is fine.  We are not going to ask you any questions at all.  So that was your opportunity.  Here's the deal. |
| Mr. Shoulders:  | But I ain't the shooter.                                                                                                                                                          |
| Agent Vose:     | Just be quiet.  You already asked for an attorney.                                                                                                                                |
| Mr. Shoulders:  | Yup.                                                                                                                                                                              |
| Agent Vose:     | Okay?  What [Agent Weber] is trying to say here and what all of this indicates and what we already know, you didn't deliver the kill shot, we know that.  But you did shoot.  So you have an opportunity to have a life after all of this.  Right?  But that's contingent upon you cooperating with us.  Because you have already asked for an attorney, like I said, we are not going to ask you |

|  | any more questions.  But when you do get an attorney let him know that we were here and we know this whole story.  Right?  We know you didn't deliver the kill shot. And that's huge, because the person who delivered the kill shot, Clarence, he's the one who is going to be paying for this.  So that's why we are here. |
|---|---|
| Mr. Shoulders: | Why did you guys know—this dude had another gun pointing at me, so I had to make the shot? |
| Agent Vose: | I am making it very clear right now— |
| Mr. Shoulders: | —I'm just saying man— |
| Agent Vose: | —We are making it very clear right now— |
| Agent Weber: | —You can choose to talk.  You said earlier— |
| Mr. Shoulders: | I am talking. I am trying to talk right now. |
| Agent Vose: | You need to clear this up. |
| Agent Weber: | I want to be clear, just for the record, I want to be clear, are you willing to talk to us about it? |
| Mr. Shoulders: | Yeah. |

Mr. Shoulders proceeded to sign a form indicating he waived his <u>Miranda</u> rights (Ex. 2), and delivered incriminating statements over the remaining fifty minutes of the interrogation.

Mr. Shoulders filed a motion to suppress the interrogation, alleging that (1) his statements were obtained in violation of his <u>Miranda</u> rights, and (2) that his statements were not voluntary.  At the evidentiary hearing, Agents Vose and Weber both testified that Mr. Shoulders clearly invoked his <u>Miranda</u> rights, and the government acknowledged the same in its post-hearing brief.  (Docs. 106 at p. 24, 25, 75; 122 at p. 2).

The government argues that, after invoking his rights, Mr. Shoulders re-engaged with the agents by stating "I don't know what you guys are talking about.  I don't know what all of this is in front of me."  (Doc. 122 at p. 2; Ex. 1 at 3:05).  Further, the government claims that Mr. Shoulders' choice to initiate discussions with the agent constituted an implied waiver of his right to silence.  (Doc. 122 at p. 4).  The government claims that after Mr. Shoulders re-engaged, no interrogation took place until Mr. Shoulders signed the form waiving his Miranda rights.

At the evidentiary hearing, Agent Weber stated he rhetorically asked Mr. Shoulders "Why shoot Chris Janis?"  Agent Weber testified, "My intention was to make a statement, telling him what the hole in our investigation was.  It came out as a rhetorical question.  It was not my intention to elicit a response from him.  I was sending him home to think about cooperating in the future, generally."  (Doc. 106 at p. 63).  The court does not find this explanation persuasive.  As discussed *infra*, Agent Weber's intent while asking this question is irrelevant.

Similarly, Agent Vose testified on why he and Agent Weber continued talking to Mr. Shoulders after he invoked his Miranda rights:

> [W]e would [continue talking] to be able to pass information on to someone like Mr. Shoulders or somebody else in that position, so that they understand the situation they're in fully.  We are basically showing our hand a little bit to them, so that they can go and talk to an attorney and tell their attorney exactly what we told them so that it puts a little bit more pressure, or whatever, on them to convince their attorney, so that they can come and talk to us later and cooperate.

(Doc. 106 at p. 25–26).

7

## DISCUSSION

A criminal suspect in custody must be informed of his right to remain silent and to have counsel appointed before being interrogated.  Miranda v. Arizona, 384 U.S. 436, 472, 479 (1966)).  Miranda warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may choose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time."  Colorado v. Spring, 479 U.S. 564, 574 (1987).   In general, any statements elicited from a suspect in violation of Miranda are inadmissible in the government's case-in-chief.  Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam).  The government has the burden of proving the defendant knowingly, voluntarily, and intelligently waived his Miranda rights.  Miranda, 384 U.S. at 479.

## I.    Whether the agents' continued questioning violated Miranda

A suspect who wishes to invoke either the right to remain silent or the right to an attorney must "do so unambiguously."  Berguis v. Thompkins, 560 U.S. 370, 381 (2010).  That is, the suspect "must articulate his desire . . . sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an invocation of the right.]"  Davis v. United States, 512 U.S. 452, 459 (1994).  Once a suspect unambiguously invokes his Miranda rights, law enforcement may not reinitiate questioning without following certain procedures.  Edwards v. Arizona, 451 U.S. 477, 484–85 (1981); Michigan v. Mosley, 423 U.S. 96, 104 (1975).  "It is the government's

burden to prove that a defendant's waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent."  <u>United States v. Caldwell</u>, 954 F.2d 496, 508 (8th Cir. 1992).  "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  <u>Miranda</u>, 384 U.S. at 475.

The court finds that Mr. Shoulders unambiguously invoked his right to counsel and to remain silent.  (Ex. 1 at  00:52–00:57; 3:00).  Agents Vose and Weber testified that they understood Mr. Shoulders' statements to be straightforward and unambiguous invocations of his <u>Miranda</u> rights.  (Doc. 106 at p. 24, 25, 75); <u>see</u> <u>Davis</u>, 512 U.S. at 459.  Furthermore, a reasonable police officer in the circumstances would have understood Mr. Shoulders' statements to be an invocation of his rights.  <u>See, e.g.</u>, <u>Smith v. Illinois</u>, 469 U.S. 91, 96–97 (1984) (suspect's statement "Uh, yeah, I'd like to do that" upon learning of his right to counsel's presence was not ambiguous); <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1041–42 (1983) (suspect's statement "I do want an attorney before it goes very much further" was not ambiguous).  Therefore, the admissibility of Mr. Shoulders' statements depend on whether the agents properly followed <u>Miranda</u>'s requirements.

 "Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."

9

Mosley, 423 U.S. at 100 (quoting Miranda, 384 U.S. at 473–74).  Statements

obtained after a suspect invokes his right to silence are only admissible if

police "scrupulously honored" his right to cut off questioning.  Otey v.

Grammer, 859 F.2d 575, 578–79 (8th Cir. 1988) (quoting Mosley, 423 U.S. at

104).  In Mosley, the Supreme Court relied on three factors to determine

whether police "scrupulously honored" a suspect's right of silence: (1) whether

police immediately terminated the interrogation upon defendant's request; (2)

whether police only resumed questioning after "the passage of a significant

period of time," that is, more than about two hours, and after providing a fresh

set of Miranda warnings; and (3) whether police restricted the later

interrogation to a crime that was not the subject of the first interrogation.

Hatley v. Lockhart, 990 F.2d 1070, 1074 (8th Cir. 1993) (citing Mosley, 423

U.S. at 106).

Similarly, "Edwards set forth a 'bright-line rule' that *all* questioning must

cease after an accused requests counsel."  Solem v. Stumes, 465 U.S. 638, 646

(1984) (emphasis in original).  The prophylactic Edwards rule is "designed to

prevent police from badgering a defendant into waiving his previously asserted

Miranda rights."  Michigan v. Harvey, 494 U.S. 344, 350 (1990); see Fare v.

Michael C., 442 U.S. 707, 719 (1979).  Once an accused who is in custody

"expresse[s] his desire to deal with the police only through counsel," he shall

not be "subject to further interrogation by the authorities until counsel has

been made available to him, unless the accused himself initiates further

communication, exchanges, or conversations with the police."  United States v.

Jackson, 852 F.3d 764, 770 (8th Cir. 2017) (quoting Edwards, 451 U.S. at 484–85); Smith, 469 U.S. at 95 (holding that an accused's statements after he invokes his right to counsel are only admissible if the accused himself initiated further discussions with police).  Here, the agents conducted a 56-minute long interrogation after Mr. Shoulders invoked his right to counsel and to remain silent.  The issue therefore is whether Mr. Shoulders initiated communication with the agents, thereby making the subsequent interrogation permissible.

### A.    Whether Mr. Shoulders initiated the interrogation

"Initiation by a defendant occurs when the defendant evinces a 'willingness and a desire for a generalized discussion about the investigation.'" Holman v. Kemna, 212 F.3d 413, 417 (8th Cir. 2000) (quoting Bradshaw, 462 U.S. at 1045–46).  Initiation is often found when law enforcement terminates an interview after a suspect invokes his right to counsel, and the suspect later spontaneously expresses a desire to talk.  By contrast, courts decline to find initiation when officers fail to immediately terminate an interview and continue encouraging the suspect to cooperate, resulting in inquiries or statements by the suspect, and an eventual waiver of the right to counsel.  Compare Bradshaw, 462 U.S. at 1042 (finding initiation where defendant asserted his right to an attorney and police immediately terminated conversation; sometime later during transport from station to jail, defendant spontaneously asked officer "Well, what is going to happen to me now?" and officer re-advised defendant of his Miranda rights before engaging in discussion where defendant agreed to take a polygraph); Lamp v. Farrier, 763 F.2d 994, 996 (8th Cir. 1995)

11

(defendant initiated by speaking with attorney over the phone during interrogation and then electing to continue answering questions); United States v. Pugh, 25 F.3d 669, 671–72 (8th Cir. 1994) (defendant asserted his rights and officers left room; defendant then initiated by shouting after them "F--- it, I might as well get this over with"); McCree v. Housewright, 689 F.2d 797, 799–800, 802 (8th Cir. 1982) (defendant initiated where, the day after asserting his right to counsel, defendant began knocking on his cell door stating he wanted to tell officers something, and when officers re-advised him of his rights defendant stated he wanted to tell them "just exactly what happened"); with Holman v. Kemna, 212 F.3d 413, 417–18 (8th Cir. 2000) (defendant did not initiate by making sporadic requests to see county police after officer met with defendant, because nothing indicated that defendant wished to talk about the investigation); United States v. Kouayara, 189 F. Supp. 3d 835, 839, 849 (D. Minn. 2016) (no initiation occurred during police interview where defendant asserted right to counsel, officer asked "Do you have a lawyer right now?" and defendant responded ". . . I need to know where I stand," because officer's question constituted interrogation); United States v. Horton, No. 4:08-CR-3005, 2009 WL 1872612, at *5–6 (D. Neb. June 30, 2009) (defendant did not initiate after invoking his right to counsel where officers continued to talk, telling him "There's always two sides to every story . . . if you're not willing to talk to us, we're never going to know that side of your story . . . we're just trying to provide you with an opportunity for you to give us your side of the story," defendant

12

asked "What kind of questions are you going to ask?" and then eventually agreed to waive his rights).

Because "interrogation" under <u>Miranda</u> refers to any words or actions that are reasonably likely to elicit an incriminating response, law enforcement may not act with the purpose of getting the suspect to confess after he invokes his right to counsel, even if those words or actions are not direct questions. <u>See</u> <u>Innis</u>, 446 U.S. at 301–02; <u>United States v. Edenso</u>, No. 15-CR-30076-RAL, 2015 WL 6108048, at *3 (D.S.D. Oct. 15, 2015).  Thus, "where an officer's statements are (1) the functional equivalent of interrogation, (2) designed to generate the retraction of an earlier request for counsel or (3) made to keep a dialogue going, a suspect cannot be said to have initiated further conversation."  <u>Edenso</u>, 2015 WL 6108048, at *3 (citing, e.g., <u>Innis</u>, 446 U.S. at 302 n.7; <u>Smith v. Endell</u>, 860 F.2d 1528, 1533–34 (9th Cir. 1988) (police may not make statements intended to extend a conversation or open up a more generalized discussion relating to the investigation); <u>Christopher v. Florida</u>, 824 F.2d 836, 845–46 (11th Cir. 1987) ("[I]n the interrogation context, [initiation] means that the suspect 'started' not simply 'continued' the interrogation. . . . [A]ny previous police-initiated interrogation [must] have ended prior to the suspect's alleged initiatory remark.")).

In <u>United States v. Horton</u>, No. 4:08-CR-3005, 2009 WL 1872612 (D. Neb. June 30, 2009), "[m]ere seconds passed between defendant's statement, 'No, I'm not' willing to waive <u>Miranda</u> rights, and the officer's explanation of why the defendant should."  <u>Id.</u> at *6.  Although the officer asked no questions,

he began a colloquy focused on "provid[ing] an opportunity for you[, the defendant,] to give us your side of the story." The district court held that the officer initiated the discussion after defendant invoked his rights because "the apparent purpose of [the officer's discussion] was to persuade the defendant to waive his <u>Miranda</u> rights[.]" The officer "again advised the defendant of his rights, and then successfully elicited defendant's statement waiving those rights." <u>Id.</u>

Similarly, in <u>United States v. Edenso</u>, the defendant stated "I want a lawyer," and the agent responded by saying "[L]et me tell you this before you go, um, if you want to talk to us before you have a lawyer present, it's better if you talk to us." 2015 WL 6108048, at *1. The agent later claimed his post-invocation statements "were only meant to give Edenso 'instruction' on how to contact the agents in the event he wanted to talk to them at a later time." <u>Id.</u> at *3. The district court found that rather, "[t]he agent's tactics appear to be a contrived attempt to get around the <u>Edwards</u> rule and to inspire Edenso to talk about what he did . . . in hopes of getting a confession." <u>Id.</u>

Here, the government argues that Mr. Shoulders initiated contact by saying "I don't know what you guys are talking about. I don't know what all of this is in front of me" after invoking his rights. (Doc. 97 at p. 4; Ex. 1 at 3:05). But unlike cases finding that the defendant initiated contact, no break occurred between Mr. Shoulders' <u>Miranda</u> invocation and the purported initiation. <u>See</u> <u>Bradshaw</u>, 462 U.S. at 1045–46; <u>McCree v. Housewright</u>, 689 F.2d 797, 799–800, 802 (8th Cir. 1982). Mr. Shoulders unambiguously

14

invoked his right to an attorney exactly 3 minutes into the interrogation.  (Ex. 1 at 3:00).  According to the government, Mr. Shoulders then decided to initiate contact exactly five seconds later.  (Ex. 1 at 3:05).  This argument is not persuasive: Mr. Shoulders' statement merely continued the FBI-initiated interrogation.  See Christopher, 824 F.2d at 845–46 (holding that "initiation" means the suspect started, not continued, the interrogation).

Moreover, Mr. Shoulders' statement did not evince a "willingness and a desire" for a discussion about the investigation.  See Oregon v. Bradshaw, 462 U.S. 1039, 1045–46 (1983).  Courts have found initiation based on suspects clearly stating they changed their mind and did want to answer questions. See, e.g., United States v. Valdez, 146 F.3d 547, 551 (8th Cir. 1998); Lamp v. Farrier, 763 F.2d 994, 996 (8th Cir. 1995); United States v. Pugh, 25 F.3d 669, 671–72 (8th Cir. 1994).  Mr. Shoulders' statement—"I don't know what you guys are talking about"—amounts to even less of an inquiry about the investigation than the question asked by the Horton defendant, "What kinds of questions are you going to ask?"  Horton, 2009 WL 1872612 at *5–6.  For these reasons, the court finds that Mr. Shoulders did not initiate contact after invoking his Miranda rights.

## B.    Whether Mr. Shoulders waived his Miranda rights

The government next argues that Mr. Shoulders waived his rights by speaking after his invocation.  A valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation."  Edwards, 451 U.S. at 484.  "Using an accused's subsequent

responses to cast doubt on the adequacy of the initial request itself is even more intolerable." <u>Smith</u>, 469 U.S. at 98–99. "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." <u>Id.</u> at 99 (internal quotations omitted).

The court further finds that the agents' continued discussion with Mr. Shoulders after he invoked his rights constituted interrogation. Like in <u>Horton</u>, seconds after Mr. Shoulders invoked his right to an attorney, Agent Weber launched into a discussion explaining why Mr. Shoulders should cooperate, insinuating that this present interview was the only opportunity to talk and obtain "any hope of leniency." (Ex. 1 at 3:00–4:30); <u>see</u> <u>Horton</u>, 2009 WL 1872612 at *6. This continued discussion appears designed to open up a generalized discussion about the investigation, and amounted to the functional equivalent of interrogation. <u>Edenso</u>, 2015 WL 6108048, at *3. Agent Weber's continued encouragement culminated in a direct question: "Why shoot Chris Janis?" This question—regardless of Agent Weber's intent—was reasonably likely to evoke an incriminating response and therefore qualified as straightforward interrogation; Agent Weber's testimony that he intended to pose a "rhetorical question" is irrelevant. <u>Innis</u>, 446 U.S. at 301.

Finally, Agent Vose testified that he intended his own statements to show the government's hand, purportedly to put pressure on the future attorney to

convince Mr. Shoulders to later return and cooperate.    (Doc. 106 at p. 25–26).
If Agent Vose's statements would put pressure on an attorney, they
undoubtedly also put pressure on Mr. Shoulders to cooperate immediately.
Like in Edenso, this court finds that the agents' tactics were a "contrived
attempt to get around the Edwards rule." Edenso, 2015 WL 6108048, at *3.
Agents Weber and Vose subjected Mr. Shoulders to interrogation in violation of
his Miranda rights.  Therefore, under Miranda and its progeny, the government
may not use any part of the interrogation in its case-in-chief.  See Smith, 469
U.S. at 95; Edenso, 2015 WL 6108048, at *3 (suppressing entire interrogation,
even though suspect eventually waived his Miranda rights in writing).

## II.    Whether Mr. Shoulders' incriminating statements were knowing and voluntary and may be used for impeachment

Although statements taken in violation of Miranda cannot be admitted in
the government's case-in-chief, they may nonetheless be admitted to impeach a
defendant's conflicting testimony if given voluntarily.  Oregon v. Hass, 420 U.S.
714, 722–23 (1975).  "A statement is involuntary when it was extracted by
threats, violence, or express or implied promises sufficient to overbear the
defendant's will and critically impair his capacity for self-determination."
Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001).  "Whether a
confession is involuntary is judged by the totality of the circumstances,"
including the "conduct of the officers and the characteristics of the accused."
United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004).  "Whether a
defendant received Miranda warnings only moments before he made his
incriminating statements . . . is a consideration the Supreme Court has treated

as important, although not dispositive, in determining voluntariness." United States v. Vega, 676 F.3d 708, 718 (8th Cir. 2012) (internal citations omitted). Other factors implicated in the analysis include the characteristics of the defendant, including prior experience with law enforcement, subjective understanding of his Miranda rights, age, and intelligence; the nature of the interrogation, including its duration and location; whether the defendant was in custody or otherwise restrained and whether law enforcement employed hostile tactics. See LeBrun, 363 F.3d at 724–27; United States v. Poor Bear, No. 16–CR–50149, 2018 WL 447105, at *8–9 (D.S.D. Jan. 17, 2018). The government bears the burden of proving by a preponderance of the evidence that the challenged statements were voluntary. United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001).

In LeBrun, the defendant was questioned in a windowless interview room containing enlarged photographs of scenes from his life. 363 F.3d at 718–19. The officers in that case conceded they used psychological ploys against the defendant. However, the Eighth Circuit found that the defendant's confession was voluntary. In so holding, the court relied on the fact that the interview was thirty-three minutes long; the officers never shouted at the defendant or physically threatened him; and the defendant was of at least average intelligence, well-educated, and subjectively understood his Miranda rights. Id. at 724–27.

Based on the totality of the circumstances present here, Mr. Shoulders' statements were not "extracted by threats, violence or express or implied

18

promises sufficient to overbear [his] will and [to] critically impair his capacity for self-determination." Simmons, 235 F.3d at 1132. Several of the LeBrun factors weigh against finding voluntariness. Namely, Mr. Shoulders was in custody and restrained in handcuffs; the agents laid out photos in front of Mr. Shoulders of Chris Janis' deceased body while beginning the questioning; and the agents re-administered Miranda rights only shortly before Mr. Shoulders' statements. See LeBrun, 363 F.3d at 724–27; Vega, 676 F.3d at 718. Further, the interrogation took place in an investigation room small enough for three or four people; the record does not state whether the room had windows. (Doc. 106 at p. 7). These factors all weigh against finding that Mr. Shoulders' statements were given voluntarily.

However, like in LeBrun, the totality of the circumstances weigh in favor of voluntariness. The interrogation was neither hostile nor combative, and lasted slightly less than an hour. Agents Weber and Vose made no threats or promises, and neither displayed their weapons nor raised their voices at any time. Mr. Shoulders was 25 years old at the time of the interview, and had a prior federal felony conviction. Significantly, Mr. Shoulders displayed his subjective understanding of his Miranda rights by repeatedly invoking both his right to silence and his right to an attorney. Finally, although the record does not contain information on Mr. Shoulders' education level, Mr. Shoulders was not under the influence of alcohol or drugs, and nothing indicated that he suffered from any sort of mental incapacity or was particularly suggestible and vulnerable to inquiries by the agents. Compare Edenso, 2015 WL 6108048, at

19

*4–5 (finding that statements were given voluntarily, even though suspect's

Miranda rights were violated and suspect was in custody, because agents were

not hostile, suspect was not particularly vulnerable, and no threats or

promises were made) with Poor Bear, 2018 WL 447105, at *8–9 (finding that

defendant's statements were not voluntary where agents interrogated her while

she was in her hospital bed suffering pregnancy complications, transported her

to a jail, and continued interrogating her; under the circumstances,

defendant's will was overborne).

     Here, the record as a whole demonstrates that Mr. Shoulders'

statements were voluntary and not the product of coercive interrogation or

overreaching.  Therefore, Mr. Shoulders' statements should be admitted at trial

solely for impeachment purposes if he elects to testify in his own defense.

### CONCLUSION

     For the aforementioned reasons, it is respectfully recommended that

Mr. Shoulders' statements taken on June 1, 2017 be suppressed in the

government's case-in-chief.

### NOTICE TO PARTIES

     The parties have fourteen (14) days after service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1),

unless an extension of time for good cause is obtained.  Failure to file timely

objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the

District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>,

781 F.2d 665 (8th Cir. 1986).

      DATED this 19th day of April, 2018.

                    BY THE COURT:

                    DANETA WOLLMANN
                    United States Magistrate Judge